## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Matthew Scott Stewart,

           Petitioner,

v.

Tracy Beltz,
*Warden*,

           Respondent.

Case No. 19-cv-2638 (WMW/TNL)

**REPORT &
RECOMMENDATION**

Matthew Scott Stewart, OID# 253466, MCF Faribault, 1101 Linden Lane, Faribault, MN 55021 (pro se Petitioner); and

Greg T. Kryzer, Assistant County Attorney, Wright County Attorney's Office, Wright County Government Center, 10 Second Street Northwest, Suite 400, Buffalo, MN 55313 (for Respondent).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Petitioner Matthew Scott Stewart's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Petition") (ECF No. 1) and Respondent Tracy Beltz's Motion to Dismiss Petition for Writ of Habeas Corpus (ECF No. 5). Petitioner is proceeding pro se. Respondent is represented by Assistant Wright County Attorney Greg T. Kryzer. This action has been referred to the undersigned magistrate judge for a report and recommendation to the Honorable Wilhelmina M. Wright, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, this Court recommends that the habeas petition be **DENIED**;

Respondent's motion to dismiss be **GRANTED**; and this action be **DISMISSED WITH PREJUDICE**.

## II. BACKGROUND

### A. Criminal Proceedings

Following a morning spent with his girlfriend and B.G.D., her 23-month-old son, Petitioner took B.G.D. to the child's bedroom after "he resisted taking a nap, as he often did." *State v. Stewart*, 923 N.W.2d 668, 671 (Minn. Ct. App. 2019), *rev. denied* (Minn. Apr. 16, 2019). B.G.D. was "fussy" and "crying." *Id.* Petitioner's girlfriend heard Petitioner ask B.G.D. if he was "done yet . . . as they commonly did when B.G.D. threw a tantrum." *Id.* (quotation omitted). "A short time later, [Petitioner] left the bedroom and spoke with [his girlfriend]." *Id.*

B.G.D. continued to cry "and [Petitioner] went back into the bedroom." *Id.* Petitioner's girlfriend "heard [Petitioner] state B.G.D.'s name in a raised voice. The crying then faded and stopped, and [Petitioner] returned to the living room." *Id.* "While speaking to [his girlfriend], [Petitioner] raised a finger and asked her to 'hold on a second,' then walked back into the bedroom." *Id.* Petitioner then "yelled for [his girlfriend]." *Id.*

"When [Petitioner's girlfriend] entered the bedroom, [she] saw B.G.D. on the floor wearing only his diaper." *Id.* B.G.D.'s "eyes fluttered, his body was rigid, he was unresponsive, and his breathing was shallow and raspy." *Id.* Recognizing that B.G.D. was having a seizure, Petitioner's girlfriend told Petitioner to call 911, which he "calm[ly] . . . did." *Id.* B.G.D. "continued seizing and began to vomit," and was subsequently taken by ambulance to the hospital. *Id.*

2

"At the hospital, B.G.D. was intubated and placed in a medically induced coma to stop the seizures. A CT scan revealed that [he] had a large subdural hemorrhage over the right side of his brain and significant brain swelling." *Id.* B.G.D. was transferred to another hospital and underwent surgery. *Id.*

"Based on the nature of B.G.D.'s injuries, the treating doctors asked child-abuse pediatrician Alice Swenson, M.D., to evaluate him. Dr. Swenson examined B.G.D. the following morning, while he was still intubated and sedated post-surgery." *Id.* at 672. Dr. Swenson

> not[ed] that he was "a generally healthy boy"; he had no history of broken bones, seizures, or major trauma; he had a history of torticollis, which is not unusual and means "his neck was sort of twisted over to one side for a period"; he had an uncomplicated circumcision; his umbilicus scar did not heal properly and required cauterization; and he sometimes banged his head on his crib or the floor, including an incident on September 12 in which he hit his head on a thinly carpeted floor "so hard that it made a noise, but he did not cry and he seemed fine afterwards."

*Id.* Additionally,

> Dr. Swenson reported that "[t]he presence of a subdural hemorrhage and significant brain injury in the absence of a history of a severe accidental trauma or medical explanation is diagnostic of abusive head trauma and child physical abuse." But she recommended additional tests to evaluate for other injuries, if and when B.G.D. stabilized, noting that it was possible B.G.D. would "not survive his injuries."

*Id.* at 672 (alteration in original).

B.G.D.'s condition gradually improved and he underwent additionally testing. *Id.* "Dr. Swenson reviewed and summarized the test results, stating they reveal extensive

3

retinal hemorrhages in B.G.D.'s right eye, no fractures, significant brain injury, and 'grossly abnormal' neurological status." *Id*. Dr. Swenson "reasoned that the absence of fractures 'does not in any way reduce the concern for abuse' and reiterated her determination that B.G.D.'s injuries 'are consistent with abusive head trauma and inflicted injury.'" *Id.*

Petitioner "was charged with first-degree assault." *Id.* Before trial, Petitioner filed a motion "in limine to prohibit expert testimony that B.G.D.'s injuries were caused by 'abusive head trauma.'" *Id.* at 672 n.2. (*See* Resp't's App. at 111, ECF No. 7.[1]) The trial court denied the motion. *Stewart*, 923 N.W.2d at 672 n.2. (*See* Resp't's App. at 131.)

At trial, Dr. Swenson testified as an expert witness for the prosecution. *Stewart*, 923 N.W.2d at 672. Dr. Swenson

> explained that "abusive head trauma" or "non-accidental abusive head trauma" (previously called "shaken baby syndrome") occurs when an infant or young child is violently shaken or slammed, which creates severe rotational forces and sudden deceleration that damage the brain. The three markers of abusive head trauma are bleeding around the brain, injury to the brain itself, and retinal hemorrhages; about half of the time, these markers are accompanied by bruises or fractures on other parts of the body. A child subjected to such trauma could exhibit symptoms such as breathing problems, seizures, or vomiting, and would "tend to present immediately," without a "lucid" or normal interval.

*Id.*

> Dr. Swenson then recounted B.G.D.'s injuries and course of medical treatment. She indicated that he exhibited all three markers of abusive head trauma, with a subdural hemorrhage, significant brain swelling, and loss of brain wave

---

[1] The Court cites to the Bates-stamped pages of Respondent's Appendix.

differentiation immediately apparent, and retinal hemorrhages apparent at the first opportunity for a dilated ophthalmologic examination. She also explained that B.G.D.'s medical history, family history, and laboratory testing revealed no physical trauma, bleeding disorder, or disease that would otherwise account for his condition. In particular, the fact that B.G.D. sometimes banged his head against the floor, like children do "all the time," would not explain his condition because children cannot create the kind of force needed to cause severe injuries. She therefore opined that B.G.D. experienced abusive head trauma immediately before becoming symptomatic.

*Id.* at 673.

Petitioner

countered with two experts. Forensic pathologist Carl Wigren, M.D., testified that various conditions can cause subdural and retinal hemorrhages and opined that abusive head trauma does not account for B.G.D.'s condition because he exhibited no fractures or bruises and the retinal hemorrhages were not discovered until after surgery. Biomechanical engineer Andre Loyd, Ph.D., likewise opined that B.G.D.'s injuries were not the result of abusive head trauma, citing studies involving test dummies that suggest [Petitioner] would have been unable to shake a child of B.G.D.'s weight (approximately 28 pounds) with sufficient force to cause the injuries.

*Id.* The jury found Petitioner guilty of first-degree assault. *Id.*

**B. Minnesota Court of Appeals**

Petitioner appealed to the Minnesota Court of Appeals. In relevant part, Petitioner challenged the sufficiency of the evidence sustaining his conviction and the admission of Dr. Swenson's expert testimony.

At the outset of his challenge to the sufficiency of the evidence, Petitioner stated that "[t]he Due Process Clause of the Fourteenth Amendment to the United States

5

Constitution requires the State, in a criminal case, to prove beyond a reasonable doubt every element of the charged offense," and "[a] conviction based upon insufficient evidence, like this one, deprives a person of his Fourteenth Amendment right to due process of law." (Resp't's App. at 72 (citing *In re Winship*, 397 U.S. 358, 368 (1970), and *Jackson v. Virginia*, 443 U.S. 307, 321 (1979)).

Petitioner's conviction was based on circumstantial evidence. *Stewart*, 923 N.W.2d at 673. (*See also* Resp't's App. at 72.) Under Minnesota law, review of convictions based on circumstantial evidence is a two-step process. *See, e.g.*, *State v. Harris*, 895 N.W.2d 592, 598 (Minn. 2017); *State v. Al-Naseer*, 788 N.W.2d 469, 473-74 (Minn. 2010). First, the reviewing court "identif[ies] the circumstances proved." *Harris*, 895 N.W.2d at 598. Second, the reviewing court "independently consider[s] the reasonable inferences that can be drawn from those circumstances, when viewed as a whole." *Id.* "To sustain a conviction based on circumstantial evidence, the reasonable inferences that can be drawn from the circumstances proved as a whole must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *Id.* (quotation omitted); *see also Al-Naseer*, 788 N.W.2d at 474 ("[I]f any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then a reasonable doubt as to guilt arises." (quotation omitted)).

Petitioner argued Dr. Swenson's expert testimony that B.G.D.'s injuries were the result of abusive head trauma was "not a circumstance proved." (Resp't's App. at 74.) Petitioner further argued that while "the circumstances proved support[ed] a rational

inference of guilt," they were nevertheless insufficient because they were not inconsistent with "all rational hypotheses other than . . . guilt." (Resp't's App. at 74.)

As for Dr. Swenson's testimony, Petitioner argued that the trial court abused its discretion in admitting the testimony because the prosecution had not shown the opinions that "B.G.D.'s injures were the result of 'child abuse' and 'the subdural hematoma and retinal hemorrhages were caused by shaking and/or impact'" were "supported by adequate foundational reliability." (Resp't's App. at 85-86.) Petitioner also argued that the trial court abused its discretion in permitting Dr. Swenson to opine on intent by "repeatedly t[elling] the jury that, in her opinion, [B.G.D.]'s injuries were the result of 'child abuse,' 'abusive head trauma,' . . . and 'non-accidental head trauma,'" thereby "distinguishing between 'an accidental injury' and 'an abusive injury.'" (Resp't's App. at 94.)

Relying on decisions of the Minnesota Supreme Court, Petitioner also requested a new trial on grounds that there were "grave doubts" over whether he assaulted B.G.D., because his "conviction [wa]s based largely, if not exclusively upon a single doctor's guess as to the otherwise unexplained cause of [B.G.D.]'s injuries." (Resp't's App. at 98.)

The Minnesota Court of Appeals affirmed Petitioner's conviction. *See generally Stewart*, 923 N.W.2d 668. The Minnesota Court of Appeals held that the evidence was sufficient to sustain Petitioner's conviction, noting that the Minnesota Supreme Court "has consistently treated the nature of injuries and their possible causes as medical 'facts' that a reviewing court must take as proved," and concluding that "the only reasonable inference from the circumstances proved [wa]s that [Petitioner] intentionally inflicted great bodily harm upon B.G.D." *Id.* at 674-75. The Minnesota Court of Appeals also held that the trial

7

court did not abuse its discretion with respect to Dr. Swenson's expert testimony, concluding that "[t]he record amply establishe[d] that the theory of abusive head trauma is reliable" and the prosecution's " written arguments" as well as "the complaint reflect[ed] the doctor's thorough diagnostic process." *Id.* at 676. Further, as "a medical expert may inform the jury's determination as to the defendant's mental state by testifying as to the nature and possible cause of a victim's injuries, including whether they could or could not have been the result of accident," Dr. Swenson's testimony was permissible because it "did not purport to decide the question of [Petitioner's] intent for the jury." *Id.* at 677 (quotation omitted). Rather, Dr. Swenson's testimony "provided medical context from which the jury made its own determination as to whether [Petitioner] intentionally inflicted B.G.D.'s injuries." *Id.*

With respect to Petitioner's request for a new trial, the Minnesota Court of Appeals noted that the Minnesota Supreme Court "may exercise its supervisory power to overturn a conviction 'in the interests of justice' but generally will not order a new trial absent prejudicial error." *Id.* at 677 n.8 (quoting *State v. Beecroft*, 813 N.W.2d 814, 846 (Minn. 2012)). Because the Minnesota Court of Appeals did not possess this "supervisory power" and, in any event, "discern[ed] no trial error," it did "not disturb [Petitioner's] conviction." *Id.*

## C. Minnesota Supreme Court

Petitioner sought further review by the Minnesota Supreme Court. (Resp't's App. at 218-29.) Petitioner continued to challenge the sufficiency of the evidence and the admission of Dr. Swenson's testimony. Petitioner's arguments focused on the state of the

8

law in Minnesota regarding circumstantial evidence; overall trends in abusive-head-trauma cases, discussing cases from other states; and the need for clarification regarding how a party demonstrates "that proffered expert-opinion testimony is supported by adequate foundational reliability" and the admissibility of expert testimony that injuries were the result of abuse. (Resp't's App. at 227; *see* Resp't's App. at 220-28.) Petitioner did not include the "grave-doubts" issue among the legal issues for which he sought further review. (*See* Resp't's App. at 218-19.) The Minnesota Supreme Court denied the petition for further review. (Resp't's App. at 242.)

### D. Habeas Proceedings

Petitioner filed the instant Petition pursuant to 28 U.S.C. § 2254. As best as this Court is able to tell, Petitioner seeks habeas relief on three grounds: (1) there was insufficient evidence that he caused B.G.D.'s injuries ("Ground One"); (2) Dr. Swenson's expert testimony on the theory of abusive head trauma was unreliable and she impermissibly opined on intent ("Ground Two"); and (3) there are "grave doubts" as to his guilt ("Ground Three"). (Pet. at 5-9; *see also* Pet. Mem., ECF No. 1-3 at 19-26.[2])

Respondent has moved to dismiss the Petition, arguing that Petitioner did not properly exhaust his remedies in the state courts and Grounds Two and Three are not matters of federal law. (*See generally* Resp't's Mem., ECF No. 6.)

---

[2] The memorandum accompanying Petitioner's Petition was not separately paginated, and therefore the Court uses the page numbers generated by the Court's electronic-filing system.

## III. ANALYSIS

A state prisoner may seek a writ of habeas corpus in federal court on the ground that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  But, in order for such relief to be granted, the state prisoner first must show that he "has exhausted the remedies available" in the state courts.  *Id.* § 2254(b)(1)(A).

To satisfy this exhaustion requirement, the state prisoner "must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review)" in a manner that alerts the court to the claim's federal nature and gives "the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations and quotations omitted); *accord O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").  "A petitioner must present *both* the *factual and legal* premises of his claims to the state courts in order to exhaust the claims properly."  *Dansby v. Hobbs*, 766 F.3d 809, 823 (8th Cir. 2014) (quotation omitted); *accord Anderson v. Groose*, 106 F.3d 242, 245 (8th Cir. 1997).  "The onus rests on the prisoner to present the substance of his federal claims in each appropriate state court . . . ."  *Turnage v. Fabian*, 606 F.3d 933, 936 (8th Cir. 2010) (quotation omitted).

### A.  Federal Nature of the Claims

"In order to fairly present a claim, a petitioner is required to refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a

state case raising a pertinent federal constitutional issue." *Nash v. Russell*, 807 F.3d 892, 898 (8th Cir. 2015) (quotation omitted).

### 1. Ground One

Beginning with Ground 1 and the sufficiency of the evidence, "[t]he Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 309. The standard of proof beyond a reasonable doubt "[i]s an essential of Fourteenth Amendment due process." *Id.* at 318; *see id.* at 316, 321. Petitioner challenged the sufficiency of the evidence on direct appeal to the Minnesota Court of Appeals, specifically referring to his right to due process under the Fourteenth Amendment as well as the Supreme Court's decisions in *Jackson* and *In re Winship*. The Court therefore concludes that the federal nature of Ground One was fairly presented to the Minnesota Court of Appeals.

### 2. Grounds Two and Three

Unlike Ground One where Petitioner referred to a specific federal constitutional right and federal constitutional caselaw, Petitioner did not refer to a specific federal constitutional right, particular constitutional provision, federal constitutional case, or state case raising the relevant federal constitutional issue for Grounds Two and Three.

With respect to Ground Two, challenges to the admissibility of Dr. Swenson's testimony were based on applications of state law. *See, e.g.*, *Garcia v. Mathes*, 474 F.3d 1014, 1017 (8th Cir. 2007) ("In the habeas context, questions regarding the admissibility of evidence are matters of state law." (quotation omitted)). While at one point Petitioner cited *Cavazos v. Smith*, 565 U.S. 1 (2011), it was not in connection with the assertion of a

11

federal claim, but part of Petitioner's argument regarding the absence of foundational reliability and alternative causes of B.G.D.'s injuries. (Resp't's App. at 91-92.) As for Ground Three, Petitioner relied solely on precedent from the Minnesota Supreme Court to argue that that "Minnesota's appellate courts have the 'duty' to grant a new trial when the court has grave doubts as to the defendant's guilt." (Resp't's App. at 98 (quotation omitted).)

The Eighth Circuit Court of Appeals "ha[s] repeatedly held that a federal habeas petitioner does not fairly present a federal issue to the state courts unless he refers to a *specific* federal right or federal constitutional provision, or cites pertinent case law discussing the federal issue in question." *White v. Dingle*, 267 F. App'x 489, 492 (8th Cir. 2008) (per curiam) (emphasis in original); *see, e.g.*, *Turnage*, 606 F.3d at 940. Petitioner did not do any of these things. Therefore, to the extent Grounds Two and Three can be read to assert violations of federal law, such federal claims were not fairly presented to the Minnesota Court of Appeals.

Moreover, the Supreme Court has explained that § 2254 "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States," and emphasized "that federal habeas corpus relief does not lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam) (quotation omitted); *see, e.g.*, *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Wilson*, 562 U.S. at 5 (quotation omitted). At

12

bottom, Grounds Two and Three are matters of state law and, as such, are not cognizable claims for relief under § 2254.

### B.  Fair Presentation of Ground One to the Minnesota Supreme Court

Even though Petitioner alerted the Minnesota Court of Appeals to the federal nature of the sufficiency-of-the-evidence claim raised in Ground One, Petitioner did not fairly present the federal nature of this claim to the Minnesota Supreme Court in his petition for further review.  As stated above, Petitioner's arguments focused on the state of the law in Minnesota regarding circumstantial evidence and overall trends in abusive-head-trauma cases.  When petitioning for further review, Petitioner did not refer to a specific federal constitutional right, particular constitutional provision, or federal constitutional case.

Nor did Petitioner fairly present the federal nature of his sufficiency-of-the evidence claim by referring to a state case raising the relevant constitutional issue.  When discussing how convictions based on circumstantial evidence are reviewed under Minnesota law in his petition for further review, Petitioner relied primarily on *Harris*, *Al-Naseer*, *State v. Stein*, 776 N.W.2d 709 (Minn. 2010), and, to a lesser extent, *State v. Hanson*, 800 N.W.2d 618 (Minn. 2011).  It cannot be said that any of these cases fairly presented a federal constitutional challenge to the sufficiency of the evidence like Petitioner raises here.[3]

---

[3] Respondent asserts that "[t]here is nothing in the[se] Minnesota Supreme Court cases . . . that *even cites or mentions* a provision of federal caselaw or federal constitutional law."  (Resp't's Mem. at 8 (emphasis added).)  While that statement may be accurate as to *Hanson*, it is less accurate with respect to *Harris*, *Al-Naseer*, and *Stein*. The dissent in *Harris* cited a number of Supreme Court decisions, and ultimately applied *Jackson*'s any-rational-trier-of-fact standard to a conviction based on circumstantial evidence.  *See, e.g.*, 895 N.W.2d at 604 n.1, 605 n.8, 606 & n.23, 607 & n.33, 607 nn.37 & 40, 609-11 & nn. 45, 52-54 (Lillehaug, J., dissenting); *see also Jackson*, 443 U.S. at 319 ("Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").  The concurrence in *Stein* similarly cited a handful of Supreme Court decisions.  *See, e.g.*, 776 N.W.2d at 721, 723, 726 (Meyer, J., concurring).  In *Al-Naseer*, due process challenges were made regarding notice of the

The handful of state cases from other jurisdictions Petitioner relied on when petitioning for review of the sufficiency of the evidence underlying his conviction are likewise unavailing. Although two of them cited *Cavazos*, it again was not in connection with a federal constitutional challenge to the sufficiency of the evidence. *Commonwealth v. Epps*, 53 N.E.3d 1247, 1267-68 (Mass. 2016); *State v. Consaul*, 332 P.3d 850, 866 n.4 (N.M. 2014). These state cases from other jurisdictions primarily addressed whether expert testimony was sufficient to support a criminal conviction and developments in the medical community regarding the cause of injuries commonly associated with "shaken baby syndrome." *See, e.g.*, *State v. Thoss*, 120 N.E.3d 1274, 1283 (Ohio Ct. App. 2018) (expert testimony); *Consaul*, 332 P.3d at 859-66 & n.4 (expert testimony); *Epps*, 53 N.E.3d at 1260-68 (shaken baby syndrome); *In re Fero*, 367 P.3d 588, 592-94, 596-98 (Wash. Ct. App. 2016) (shaken baby syndrome), *rev'd*, 409 P.3d 214 (Wash. 2018); *State v. Edmunds*, 746 N.W.2d 590, 593, 596-99 (Wis. Ct. App. 2008) (shaken baby syndrome). Thus, they too cannot be said to have fairly presented a federal constitutional challenge to the sufficiency of the evidence.

Acknowledging that he did not "technically" cite the Supreme Court's decision in *Jackson* to the Minnesota Supreme Court, Petitioner nevertheless maintains Ground One was fairly presented because he did raise sufficiency-of-the-evidence arguments to the Minnesota Supreme Court. (Pet'r's Mem. in Supp. at 2-3, ECF No. 9.) But, "[i]t is not enough to recite only the facts necessary to state a claim for relief." *Turnage*, 606 F.3d at

charges and the opportunity to present a defense. 788 N.W.2d at 472; *accord id.* at 484 (Stras, J., dissenting). Deciding the case on other grounds, the majority did not address those challenges, but the dissent did. *Compare* 788 N.W.2d at 472, 481 n.5 *with* 788 N.W.2d at 484 (Stras, J., dissenting).

14

936 (quotation omitted). Moreover, "mere similarity between state law claims and federal habeas claims is insufficient to satisfy the fair presentation requirement." *Id.* (quotation omitted). While Petitioner's arguments to the Minnesota Supreme Court are certainly similar to Ground One in that those arguments and Ground One both relate to the sufficiency of the evidence supporting his conviction, the Eighth Circuit Court of Appeals has made clear that the fair presentation requirement "is not met by presenting a claim that is merely similar to the federal habeas claim." *Nash*, 807 F.3d at 898 (quotation omitted); *accord Turnage*, 606 F.3d at 936.

Because Petitioner did not fairly present the federal nature of his sufficiency-of-the evidence claim to the Minnesota Supreme Court, he failed to exhaust his state court remedies with respect to Ground One.

### C. Procedural Default

Not only was Ground One not fairly presented, it is now procedurally defaulted. A claim is unexhausted if state law allows the petitioner to raise the claim by any available state court procedure. *See* 28 U.S.C. § 2254(c). But, if a petitioner has not fairly presented his claim in state court *and* a state procedural rule precludes further litigation of the claim, that claim is procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Abdullah v. Groose*, 75 F.3d 408, 411 (8th Cir. 1996) ("If a prisoner has not presented his habeas claims to the state court, the claims are defaulted if a state procedural rule precludes him from raising the issues now."). In Minnesota, "where direct appeal has once been taken, all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief." *State v. Knaffla*, 243

N.W.2d 737, 741 (Minn. 1976).   Thus, Minnesota law provides a procedural rule that denies further litigation of a claim that could have been raised on direct appeal.   *Murphy v. King*, 652 F.3d 845, 849-50 (8th Cir. 2011).   This rule "bars not only claims that were known at the time of direct appeal, but also claims that *should have* been known."   *Sontoya v. State*, 829 N.W.2d 602, 604 (Minn. 2013) (citing *Knaffla*, 243 N.W.2d at 741).   Because Petitioner challenged the sufficiency of the evidence on direct appeal, Minnesota's *Knaffla* rule bars him from pursuing it in a subsequent petition for postconviction relief.   Therefore, Ground One is procedurally defaulted.

### D. Exceptions Not Applicable

Procedurally defaulted claims are generally barred from federal habeas review. *Coleman*, 501 U.S. at 750.   The merits of a procedurally barred claim will be addressed by a federal court only when one of two narrow exceptions applies: (1) where the state "prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) where the state prisoner can "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."   *Id.*; *see also McCall v. Benson*, 114 F.3d 754, 758 (8th Cir. 1997).   If neither of these exceptions applies, the merits of a procedurally defaulted claim will not be entertained by a federal court.   *See, e.g.*, *Murphy*, 652 F.3d at 850 (declining to excuse petitioner's procedurally defaulted claims for failure to establish either of the procedural bar exceptions).

Petitioner has not claimed that either exception is applicable here.   Rather, in responding to Respondent's motion to dismiss, Petitioner maintains that Ground One was sufficiently presented.   (*See* Pet'r's Mem. in Supp. at 2-4.)   As explained above, however,

16

Petitioner did not fairly present a federal constitutional challenge to the sufficiency of the evidence to the Minnesota Supreme Court. "Because [Petitioner] has not established cause for the default, the question of prejudice need not be reached." *Murphy*, 652 F.3d at 850. Lastly, Petitioner has not presented any new evidence affirmatively demonstrating that he is innocent of the crime for which he was convicted. *See id.* ("To fall within the fundamental-miscarriage-of-justice-exception, a habeas petitioner must present new evidence that affirmatively demonstrates that he is innocent of the crime for which he was convicted." (quotation omitted)).

**E. Summary**

In sum, Grounds Two and Three are matters of state law and not cognizable claims for relief under § 2254. With respect to Ground One, Petitioner failed to fairly present the federal nature of his sufficiency-of-the evidence claim to the Minnesota Supreme Court in his petition for further review. Because Minnesota's *Knaffla* rule bars further litigation of his sufficiency-of-the-evidence claims, Ground One is procedurally defaulted. And, because Petitioner "has not demonstrated cause to excuse the default or a miscarriage of justice," his Petition must be summarily denied. *Id.*; *see also*, *e.g.*, *Turnage*, 606 F.3d at 942.

**IV. CERTIFICATE OF APPEALABILITY**

A habeas corpus petitioner filing a petition under 28 U.S.C. § 2254 cannot appeal an adverse ruling on his petition unless he is granted a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1). A Certificate of Appealability may be granted only if the petitioner "has made a substantial showing of the denial of a

17

constitutional right." 28 U.S.C. § 2253(c)(2).  In order to do so, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, it is highly unlikely that any other court would treat Petitioner's claims for relief differently than they are being treated here.  Petitioner has not identified (and this Court cannot discern) anything novel, noteworthy, or worrisome about this case that warrants appellate review.  It is therefore recommended that Petitioner should not be granted a Certificate of Appealability in this matter.

[Continued on next page.]

## V. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (ECF No. 1) be **DENIED**.

2. Respondent's Motion to Dismiss (ECF No. 5) be **GRANTED**.

3. This action be **DISMISSED WITH PREJUDICE**.

4. Petitioner should **NOT** be granted a Certificate of Appealability.

Date: March____4____, 2020                    _____*s/ Tony N. Leung*_____
                                              Tony N. Leung
                                              United States Magistrate Judge
                                              District of Minnesota

                                              *Stewart v. Beltz*
                                              Case No. 19-cv-2638 (WMW/TNL)

## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).